In the Matter of the Application of the ST. LAWRENCE TRANS-
MISSION COMPANY, Relator, for a Writ of Certiorari to JAMES
McAVOY and Others, as Assessors of the Town of Colton, St.
Lawrence County, New York, Defendants.

(Three proceedings, one for each of the years 1921, 1922 and 1923.)

In the Matter of the Application of the ST. LAWRENCE VALLEY
POWER CORPORATION, Relator, for a Writ of Certiorari to JAMES
McAVOY and Others, as Assessors of the Town of Colton, St.
Lawrence County, New York, Defendants.

(Two proceedings, one for each of the years 1924 and 1925.)

In the Matter of the Application of the ST. LAWRENCE VALLEY
POWER CORPORATION, Relator, for a Writ of Certiorari to JAMES
McAVOY and Others, as Assessors of the Town of Colton, St.
Lawrence County, New York, Defendants.

(Two proceedings, one for each of the years 1926 and 1927.)

In the Matter of the Application of the ST. LAWRENCE VALLEY
POWER CORPORATION, Relator, for a Writ of Certiorari to JOHN
N. WATSON and Others, as Assessors of the Town of Colton, St.
Lawrence County, New York, Defendants.

(Proceeding for the year 1928.)

Supreme Court, St. Lawrence County, November 4, 1929.

*George E. Van Kennen* [*Delos M. Cosgrove* and *Loren E. Harter* of·counsel], for the relator.

*Purcell, Cullen & Pitcher* [*Francis E. Cullen* of counsel], for the defendants.

ALDEN CHESTER, Referee. These several proceedings have been tried together. The proceedings for 1921, 1922 and 1923 were brought by the St. Lawrence Transmission Company as relator and the proceedings since that date were brought by the St. Lawrence Valley Power Corporation as relator, all covering the same real property, the corporate name of the first named relator having been changed to that of the last named relator prior to the assessment of 1924 but such change resulted in no change of interest or ownership.

In each of the eight proceedings the relator claims that the assessment is invalid, illegal, erroneous and incorrect, the main contention being that the assessment of relator's property is unequal in that it was made at a higher proportionate valuation than the assessment of other property on the same roll.

In the years 1921, 1922, 1923 and 1924 the relator's property was assessed at the same valuation and by the same description. The first five items upon the rolls of 1921, 1922, 1923 and 1924, assessed at a total of $1,200 in each year, and the first two items upon the rolls of 1925, 1926, 1927 and 1928, assessed at a total of $700, are not matters of dispute in these proceedings. The controversy arises over the last item upon each roll which was assessed for the first four years at $550,020 and for the last four years at $550,050. It is upon this parcel that the dam and pipe line of relator have been constructed, and which parcel is described on the roll for each of said first five years and also on the roll for 1926 as follows: " Extending on both sides of Racquette River. Bd. North by the North Town Line of the Town of Colton, St. Lawrence Co., Bd. East by the Highway leading from Potsdam to Colton, St. Lawrence Co., Bd. South by Colton jail, Colton, St. Lawrence Co., Bd. West by the Highway leading from Potsdam to Colton, St. Lawrence Co. and including the bed of the Racquette river within the above boundaries and the water rights appurtenant to or a part of the above described property. 246 3/8 acres."

In the rolls for the years 1927 and 1928 the description was materially changed, undoubtedly to meet the objection that the description on the rolls for the prior years included property not belonging to the relator.

During the years from 1919 to 1928, both years inclusive, there have been repeated changes in the individuals comprising the assessors of Colton as appears by the record in the proceedings for the various years.

A proceeding brought by the St. Lawrence Transmission Company against the assessors of Colton to review their assessment of 1919 was tried before me as referee and resulted in a report reducing to

$250,000 an assessment of $500,000 on the "Colton Dam and Penstock" hereinafter referred to. This report was adopted by the court and a final order or judgment in accordance therewith was entered. From this judgment the defendants took an appeal to the Appellate Division where the judgment was affirmed. (211 App. Div. 826.)

In the assessment for 1919 the assessors did not include any part of the value of the water power as appurtenant to the dam and penstock but did include water power as appurtenant to some of the other property mentioned in that assessment. In the proceedings for the years subsequent to 1919, on trial here, the value of the entire water power belonging to the relators in the town of Colton, as appurtenant to their dam and penstock there and to their other property included in such assessments, is the principal contention between the parties.

The relators claim also that in each of the years prior to 1927 the assessment is illegal because their property is erroneously described and that the description in the roll contains lands which were not owned by the petitioners.

The parties to the eight proceedings now being tried have stipulated in each proceeding many of the essential facts involved in it and a brief summary of these facts is hereinafter mentioned.

These relators are each public service corporations organized under the laws of New York. Prior to 1917 the St. Lawrence Transmission Company purchased certain riparian lands, water rights and privileges appurtenant thereto in the town of Colton. Such riparian lands were of negligible value except for water power purposes. In the years 1917–1918 such company constructed upon said lands a concrete dam across the Racquette river in the town of Colton, which was approximately 400 feet in length over all, 21 feet in height and varied from 15 to 28 feet in thickness at its base. In the same years such company constructed a penstock or pipe line 13,092 feet in length extending overland from such dam to its power house situate downstream in the town of Parishville, only 5,778 feet of which was in the town of Colton. Such penstock or pipe line was 12 feet in diameter and the part of it in Colton was constructed of wooden staves $3\frac{1}{2}$ inches in thickness bound by iron hoops from $\frac{3}{4}$ of an inch to $\frac{7}{8}$ of an inch in thickness placed at varying distances apart. Approximately 2,690 feet of such line in the towns of Pierrepont and Parishville are constructed of steel. The riparian lands, water rights and privileges, the dam and hydraulic works connected therewith, the penstock or pipe line, together with the power house, machinery and equipment constituted such company's hydro-electric plant for the generation of electricity. The

total fall of the stream from the crest of the dam in Colton to the power house in Parishville is 284 feet, of which 239 feet is in the town of Colton, that is eighty-four per cent of the entire fall is in Colton and sixteen per cent in Parishville. Based upon the stream flow records at this point on the Racquette river, the gross available power of the Colton plant for the average year for commercial usable purposes is 14,440 horsepower, and the amount of power at the north line of the town of Colton is 12,200 horsepower. These figures are horsepower years per year. There is approximately, 2,500 horsepower of primary or firm power, that is power available continuously based upon the average flow for the lowest month and the balance of the power available is secondary surplus power, viz., power which is available for a fractional part of year only.

The ratio of the assessment and the fair market value of the property upon the assessment roll for each of the eight years in question, except the property of the relator, is fifty-five per cent and the stipulation provides that the referee may adopt that figure as the basis for his consideration of the evidence.

The actual cost of the dam and hydraulic works connected therewith in the town of Colton, constructed as aforesaid in 1917 and 1918, was $186,044.63.

The actual cost of the portion of the penstock or pipe line in the town of Colton, constructed in the years 1917–1918, was $282,539.97. This is the *pro rata* part of the entire part of the entire cost of the pipe line without taking into consideration the fact that the cost per foot of such pipe line in the town of Colton would run about half the average cost per foot of the pipe line outside the town of Colton.

The dam and hydraulic works connected therewith and the penstock or pipe line were constructed during the great war. About the peak of prices prevailed. The work was performed at an unseasonable time. The concrete was poured in the winter months. Embargoes on the purchase and shipment of material and delays in the delivery thereof existed. The scale of wages was exceptionally high. The cost of such structures at the time they were built was approximately fifty per cent higher than the reproduction cost in the year 1919 when the plant was first put in operation.

The reproduction cost of the dam and the portion of the penstock pipe line in the town of Colton in 1919 was approximately $312,389.66.

Much of the testimony given by witnesses on the trial of the proceeding to review the 1919 assessment have, pursuant to the stipulations, been read in evidence on this trial. This includes

the testimony of several experts on each side on the question of values. As usual in such cases the opinions of the witnesses on the respective sides widely differ.

There is no substantial difficulty, as I view it, in deciding the questions of law involved in the proceedings, but the determination of the questions of fact upon the voluminous stipulations as to some of them having a bearing on the question of values, especially when the experts employed by the respective parties so widely differ in their opinions based largely on these stipulated facts, present unusual difficulties.

Under the Revised Statutes (1 R. S. 391, tit. 2, art. 2, § 17) the assessors with respect to the determination of assessable values were called upon to assess the land at its full and true value as they would appraise the same in payment of a just debt due from a solvent debtor.

Section 6 of the Tax Law (as amd. by Laws of 1914, chap. 277) provides that " all real and personal property subject to taxation shall be assessed at the full value thereof."

It is conceded here that the property in question had no market value. For that reason evidence of the cost of reproduction and of depreciation has been received. That course was held to be proper in *People ex rel. New York Dock Company* v. *Cantor* (208 App. Div. 52) and in several other authorities which it is needless to cite.

It is urged by the defendants that the judgment in the 1919 case that the assessed value of the dam and penstock was $250,000 is *res judicata* and binding upon the parties to the several proceedings now being tried, subject, however, to the right of any party to show that the value of the dam and penstock has changed since the time of which the judgment speaks.

If it was true that during all these years from 1921 to 1928 the parties were the same and the facts were like the facts under the 1919 assessment, there would be much more foundation for the claim that the judgment with respect to that assessment is *res judicata*.

But the fact is that the assessors changed the form of the assessment made in 1921 and the years subsequent thereto as compared with the assessments made in 1919 and 1920. It also appears that the personnel of the board of assessors varied from year to year, only one of them being on the board during all the years in question. Nor was the question of the depreciation of the dam and pipe line involved to any great extent in the proceeding for 1919 for they were new at the time, having been completed just before the assessment for that year was made.

In *People ex rel. Eckerson* v. *Zundel* (157 N. Y. 513, 518) the Court of Appeals, speaking by MARTIN, J., said: " We are aware of no principle upon which it can be properly held that assessors, who are required to make a sworn appraisal of the value of the property assessed, are concluded by the action of other and preceding assessors, or by any judgment that may be recovered against them in relation to assessments of preceding years. The assessment for each year is a distinct proceeding, separate from other assessments, and a judgment against one set of assessors ought not to be held to control the action of other assessors who are subsequently elected." (See, also, *People ex rel. Norwich Pharmacal Co.* v. *Porter*, 132 Misc. 609, where it was held that a final order in certiorari proceedings to review an assessment for 1920 cannot be pleaded as *res judicata* in a proceeding to review an assessment for 1921 on the same property when neither the parties nor the facts are the same in the two proceedings.)

I think, therefore, the doctrine of *res judicata* is not applicable to the proceedings on trial here.

On the assessment of the " Colton dam and penstock " in 1919 no water power or rights were mentioned as appurtenant thereto but water power and rights were mentioned as appurtenant to several other pieces of real property belonging to the relator on the same roll, and it was stated in the opinion of the referee in deciding the proceeding under that assessment in referring to these facts that " The assessment having been made in that way by the assessors, they at least are bound by it, and can hardly now be permitted to claim that the value of water power or other property rights not described in the item should be considered in support of the assessed value they have placed upon the Colton dam and penstock. Nor do I think, if the respondents have placed too low a value upon the petitioners' water power and water rights as appurtenant to the various parcels of land described and assessed by them on their roll, these values can be increased by the court to support or make up or to balance any overvaluation which they have placed on the dam and penstock. (*People ex rel. Kemp R. E. Co.* v. *O'Donnell*, 198 N. Y. 48.) That in effect would be making a new assessment instead of reviewing one already made."

I cite here in support of that principle a decision by the Court of Appeals made a short time after that opinion was written, viz., *People ex rel. City of New York* v. *Keeler* (237 N. Y. 332).

On the roll for 1919 all the other property and water power mentioned was assessed at $49,900. I mention this fact and quote from my opinion as above stated to show that it was apparent that I believed at the time the proceeding under the 1919 assessment

was decided, that the total water power belonging to the relator was in fact of greater value than the amount mentioned by the assessors in their roll of that year and that in fixing the value on the dam and penstock they probably thought that some part of the water power appurtenant thereto was included in their assessment when in fact it was not so included. This matter is alluded to also in support of the conclusion I have reached that the judgment relating to the above-mentioned assessment of $49,900 is no more *res judicata* than was the judgment fixing the assessed value of the dam and penstock at $250,000 without including therein the value of any water power.

It appears to me, therefore, that it is my duty to review the assessments made in 1921 and in the years subsequent thereto in the proceedings now on trial and to make my report thereon based wholly on the evidence with relation to these several assessments and without being bound by the doctrine of *res judicata* because of the judgment under the 1919 assessment.

It appears that the defendants have assessed the relator's property at substantially the same value during each of the eight years involved in these proceedings while there is undisputed evidence that the dam and pipe line have depreciated very materially in value each year during that time. The law is clear that it is the duty of the assessors to put their values upon the property assessed as of the time when their assessment was made. If there has been substantial depreciation in its value during each of these years the law in this respect has not been observed by them, unless some part of the relator's property other than the dam and pipe line have correspondingly increased in value during these years.

The relator has produced testimony that the reproduction cost of the dam on July first of each year and the depreciation on those dates during the period from 1921 to 1928 inclusive were as follows:

| Year | Reproduction cost | Depreciation |
|------|------|------|
| 1921 | $101,000 | $3,000 |
| 1922 | 107,500 | 4,000 |
| 1923 | 129,000 | 5,000 |
| 1924 | 127,700 | 6,000 |
| 1925 | 127,700 | 7,000 |
| 1926 | 130,000 | 8,000 |
| 1927 | 123,000 | 9,000 |
| 1928 | 123,000 | 10,000 |

The relator has also produced testimony that the reproduction cost of the part of the pipe line or penstock in the town of Colton

on July first of each year and the depreciation on these dates during the period from 1921 to 1928 inclusive were as follows:

| Year | Reproduction cost | | Depreciation |
|---|---|---|---|
| 1921 | $243,340 | 20% | $48,668 |
| 1922 | 248,981 | 30% | 74,694 |
| 1923 | 279,731 | 40% | 111,892 |
| 1924 | 278,977 | 50% | 139,488 |
| 1925 | 278,041 | 52½% | 145,972 |
| 1926 | 282,000 | 55% | 155,000 |
| 1927 | 270,000 | 60% | 162,000 |
| 1928 | 270,000 | 65% | 175,500 |

The dam was a concrete one and as has been stated was constructed at an unseasonable period and the cement work laid in the winter. It had the customary spillways, rolling gates, log sluices and head gates.

The pipe line in Colton was constructed of wooden staves. It was examined by the witnesses and they testified that the staves had rotted and decayed in hundreds of places from a depth of from one-half inch to a maximum depth of two inches, so that many of them had to be taken out and replaced by new staves. In other places the decayed portions had been scraped out and the remainder treated with creosote. This repair work was performed in 1924 which fact explained the reduction stated by the witnesses in the percentage of depreciation after that date appearing in the above table as the creosote applied acted as a preservative.

The evidence above mentioned as to the reproduction cost and depreciation of the dam and pipe line is wholly undisputed. It is urged that as the pipe line was completed in 1919, covered over with earth and not uncovered until 1924 when it was repaired, the witnesses could not have seen it during that time; therefore, when they stated the extent of the depreciation in percentages their evidence was largely conjecture. It is true that theirs was opinion evidence in those respects and is to be weighed as all opinion evidence should be and given so much credit only as the facts upon which the opinions are based will justify. The several witnesses who gave these opinions agreed to a dollar as to the amounts they severally stated was the depreciation, which only shows that they had conferred together before giving their testimony. Upon the facts testified by them as the foundation or justification for their opinions as to depreciation, which have only been briefly referred to herein, and in view of the fact that such depreciation must have been progressive during the years in question, I have reached the conclusion that their opinions are substantially correct.

Their testimony with respect to reproduction cost is based upon their knowledge of the cost of labor, materials and conditions prevailing at the time of which they speak, and not being disputed in any way, it should be followed.

The next question to be considered, viz., the value of the water power belonging to the relator in the town of Colton, presents to my mind a much more difficult question to decide.

It has been stipulated that all the riparian lands, water power, water rights and privileges appurtenant thereto connected with relator's plant or project in the towns of Colton and Parishville were purchased by the St. Lawrence Transmission Company in the year 1917 at a cost of $125,000. On this basis the portion of such property in the town of Colton was $105,000. Such property was purchased by the last named company's predecessor in title at various times between 1891 and 1916 at not to exceed the sum of $83,000. It was purchased in several parcels at different times between the above-mentioned dates and was combined into one power site.

It has also been stipulated that these riparian lands were of negligible value except for water power purposes, and that the values of undeveloped water power have not materially changed since the times referred to by the witnesses.

The above-mentioned purchase prices, while proper to be considered, are not at all conclusive as to the value of the water rights at the times these several assessments were made.

As has been stated, several experts were sworn on each side as to the values of the water power in the 1919 proceeding and their testimony has been read in the proceedings now on trial. For the defendants their principal witness testified that in his opinion the fair market value of the undeveloped real estate and water rights in the town of Colton was $840,000. Another witness for the defendants by a different process of reasoning testified that in his opinion such value on that date was $875,000. Each witness stated the facts upon which he based his opinion as to these values.

The experts sworn on behalf of the relator gave it as their opinions that these water rights were not worth any more than they cost and even said that they were worth much less. The counsel for the relator has urged that they were worth no more than they cost, viz., $105,000.

After a careful consideration of the testimony and the stipulated facts in the several proceedings I agree with the statement made by the learned counsel for the defendants that " It is perfectly clear the evidence of the expert engineers as to calculated values might lead one to almost any result if he were to accept it without careful scrutiny * * *. The task for the court is to determine,

so closely as may be, what the undeveloped land and water rights of the relator in the town of Colton would sell for, with the fictional ready buyer and willing seller on July 1 of each year contested." The wide difference in the opinion of these experts comes largely from their different views of the market value of the defendant's power. The relator contends and the proof establishes, I think, that in the section of the State where its power must be sold the market demands cheap power in large quantities, as it is largely used in grinding pulp and in the manufacture of paper, and that during seven of the eight years in question it received approximately an average of only three and seventy-five one-hundredths mills net per kilowatt hour, instead of a considerably higher price considered by the defendants' experts in forming their opinions as to the value of the water power.

In this connection it may be stated that the relator has been selling large quantities of power to the Aluminum Company of America, which is a company closely allied to the relator, at twenty-four dollars per horsepower year, which is equivalent to .00368 per kilowatt hour. This no doubt affects the value of the relator's water rights, in view of the fact that it has been selling much electric power to others at a higher price. I believe I have given due weight to this feature in the conclusion I have reached as hereinafter stated.

On the other hand, one of the defendants' experts stated in substance that his testimony as to the price of power was not based upon conditions existing at the time he was sworn but upon his assumption of an increase in the market price at a period of five years in the future. This hardly comports with the rule that the values must be based upon conditions existing at the time the assessment is made.

It is impossible to reconcile these widely different opinions. While these experts are all men of large experience in their professions I can only say what is true in most cases of expert testimony, that the witnesses usually go as far as their consciences will permit in sustaining the interests of the party who employs them, and they have evidently done so in their testimony here. I cannot avoid, therefore, the expression of my belief that upon all the testimony in the proceedings and after a careful consideration of the statements of the several experts as to the reasons for their opinions, that when the defendant's witnesses gave the value of these water rights as $840,000 or more, they placed them much too high and that when the relator's witnesses gave such value as $105,000 or less they placed them much too low.

Since these undeveloped water rights were purchased by the relator they have been developed at large expense and have been

in use during each of the eight years involved in these proceedings. This fact to my mind, in connection with all the other testimony, has brought about a substantial increase in the value of the relator's water power since its development was completed and apparently such value has not materially changed since that time. No one can reconcile the testimony of these experts, and I think the fairest result will be obtained in view of all the other testimony by taking the mean of these two extremes, that is of $840,000 on the one hand and $105,000 on the other, which is $472,500, as the value of the relator's water power and the lands connected therewith when these several assessments were made.

The following is a table showing the values of relator's property in Colton during the eight years involved in these proceedings made in harmony with this opinion, giving *first*, the reproduction cost or value of the dam less depreciation; *second*, the reproduction cost or value of the pipe line less depreciation, each based upon the tables above set forth, and *third*, the value of the water power and riparian lands (246⅔ acres). Fifty-five per centum of the sum of these three items is the assessable value, to which must be added the assessed value of the several uncontested items on the several rolls, viz.:

### 1921

| | |
|---|---:|
| First, dam, less depreciation | $98,000 |
| Second, pipe line, less depreciation | 194,672 |
| Third, water rights and land | 472,500 |
| Total | $765,172 |
| Assessable value (fifty-five per cent of total) | $420,845 |
| (When the percentage results in giving a fractional part of a dollar over fifty cents, one dollar is added to the value in each instance.) | |
| Add assessed value of property on roll not contested | 1,200 |
| Total assessment value | $422,045 |

### 1922

| | |
|---|---:|
| First, dam, less depreciation | $103,500 |
| Second, pipe line, less depreciation | 174,287 |
| Third, water rights and land | 472,500 |
| Total | $750,287 |
| Assessable value (fifty-five per cent of total) | $412,658 |
| Assessed value not contested | 1,200 |
| Total assessment value | $413,858 |

### 1923

| | |
|---|---|
| First, dam, less depreciation | $124,000 |
| Second, pipe line, less depreciation | 167,834 |
| Third, water rights and land | 472,500 |
| Total | $764,334 |
| Assessable value (fifty-five per cent of total) | $420,384 |
| Assessed value not contested | 1,200 |
| Total assessment value | $421,584 |

### 1924

| | |
|---|---|
| First, dam, less depreciation | $121,700 |
| Second, pipe line, less depreciation | 139,489 |
| Third, water rights and land | 472,500 |
| Total | $733,689 |
| Assessable value (fifty-five per cent of total) | $403,529 |
| Assessed value not contested | 1,200 |
| Total assessment value | $404,729 |

### 1925

| | |
|---|---|
| First, dam, less depreciation | $120,700 |
| Second, pipe line, less depreciation | 132,069 |
| Third, water rights and land | 472,500 |
| Total | $725,269 |
| Assessable value (fifty-five per cent of total) | $398,898 |
| Assessed value not contested | 700 |
| Total assessment value | $399,598 |

### 1926

| | |
|---|---|
| First, dam, less depreciation | $122,000 |
| Second, pipe line, less depreciation | 127,000 |
| Third, water rights and land | 472,500 |
| Total | $721,500 |
| Assessable value (fifty-five per cent of total) | $396,825 |
| Assessed value not contested | 700 |
| Total assessment value | $397,525 |

### 1927

| | |
|---|---:|
| First, dam, less depreciation...................... | $114,000 |
| Second, pipe line, less depreciation.................. | 108,000 |
| Third, water rights and land...................... | 472,500 |
| Total........................................ | $694,500 |
| Assessable value (fifty-five per cent of total).......... | $381,975 |
| Assessed value not contested...................... | 700 |
| Total assessment value....................... | $382,675 |

### 1928

| | |
|---|---:|
| First, dam, less depreciation...................... | $113,000 |
| Second, pipe line, less depreciation.................. | 94,500 |
| Third, water rights and land...................... | 472,500 |
| Total........................................ | $680,000 |
| Assessable value (fifty-five per cent of total).......... | $374,000 |
| Assessed value not contested...................... | 700 |
| Total assessment value....................... | $374,700 |

Two other questions remain to be briefly considered.

The relator alleges that the assessors have not properly described its property on the assessment rolls for the years 1921, 1922, 1923, 1924, 1925 and 1926 in that the boundaries mentioned on the rolls for those years include a considerable area of property that does not belong to the relator.

This claim, if true, would present a much more serious question if there had been a sale for unpaid taxes or if it arose upon an attempted ejectment to procure possession of the property after a sale, but I do not recall that there is any proof of any sale for unpaid taxes. I assume, therefore, that as in the 1919 proceedings the taxes imposed have been paid by the relator to avoid the penalties that would have been incurred by reason of their non-payment, and that these proceedings to review have been instituted in part for the purpose of recovering such part if any of such taxes as it might be determined had been improperly levied, the error in the description, if it exists, is of little importance. The land which it is alleged has been improperly included does not touch the river nor affect the water rights in any way, and it has been stipulated that the lands are of negligible value except for water

power purposes. The description in question locates the property on both sides of the Racquette river, including the bed of that stream from the north line to the south line of the town of Colton, and gives the correct acreage of the tract, which is bounded on the east and west by certain highways which diverge from it in places.

I think the property is sufficiently described on the rolls to reasonably identify it to a person who is familiar with it as the particular property which it was intended to assess, and, therefore, the assessments should not be declared invalid on this account. (*People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Mealey*, 224 N. Y. 187.)

The other question to be decided arises on a motion which was made by the defendants to quash the writ of certiorari in the 1924 proceeding, which motion was argued before the late Justice Borst, who resigned as justice without deciding the motion. It was then stipulated by the attorneys that the motion be submitted to me as referee and that such proceeding continue just as if an order of reference had been made. On the trial before me I denied that motion *pro forma*.

On examining it further I think that decision was correct and should stand.

The relator's attorney may prepare and send to me for signature referee's reports in harmony with this opinion, containing findings of fact and conclusions of law, reducing the assessments for the years in question to the amounts stated in the table above set forth, with costs against the town of Colton, the tax district represented by the defendants.